## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: _____

_____
RUOXUE WU,                                   )
     Plaintiff,                            )
v.                                           )
LEI MA, and                                  )
WORCESTER POLYTECHNIC INSTITUTE,             )
     Defendants.                          )
_____)

## VERIFIED COMPLAINT

Now comes Plaintiff in the above-entitled action and says as follows:

## PARTIES

1. Plaintiff, Ruoxue Wu ("Plaintiff"), is an individual residing at 520 Riverglade Drive, Apt J, Amherst, MA 01002.

2. Defendant, Lei Ma ("Defendant Ma"), is an individual residing in Worcester, MA.

3. Defendant, Worcester Polytechnic Institute ("Defendant WPI"), is a school with its principal office located at 100 Institute Road, Worcester, Massachusetts 01609.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 and 1367(a).

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b).

## FACTUAL BACKGROUND

6. Plaintiff began struggling with depression when she was approximately twelve (12) years old.

7. Plaintiff was born in Henan, China in 1988.

8.  When Plaintiff was around the age of five (5), her parents divorced due to her biological mother's infidelity.

9.  Her biological mother was given custody.

10. Plaintiff's biological mother had no job and was dependent on Plaintiff's father for money and a nanny to take care of Plaintiff.

11. Plaintiff's mother was a spendthrift and often ran out of money early.

12. Plaintiff's mother threatened Plaintiff's father with abandoning Plaintiff unless she received more money.

13. Plaintiff went to live with her father after Plaintiff's mother abandoned her for the fourth time.

14. Plaintiff was raised by her stepmother, who was abusive towards Plaintiff.

15. If Plaintiff's father was not around, Plaintiff's stepmother would often fail to make food for Plaintiff.

16. Plaintiff's stepmother would tell Plaintiff that she was the cause of ruining the happiness of the family.

17. Plaintiff's stepmother would not allow Plaintiff to use the home phone or stay in the living room.

18. Plaintiff's stepmother would tell Plaintiff's father, neighbors, relatives, and friends that Plaintiff had done things, which Plaintiff did not do, in order drive a wedge between Plaintiff and everyone around her.

19. Plaintiff was forced to live with her grandmother when Plaintiff's stepmother became pregnant and would not let Plaintiff return home.

20. Plaintiff tried returning home several times to gather her belongings, but Plaintiff's stepmother yelled at her to leave.

21. Plaintiff's stepmother later threw away Plaintiff's belongings.

22. Plaintiff's stepsister told Plaintiff that Plaintiff's stepmother had been smearing her since she was a child.

23. Plaintiff's stepmother and father's mutual friends also said that Plaintiff's stepmother had said that if Plaintiff's father was gone, she not give Plaintiff any of the family money and kill Plaintiff.

24. While Plaintiff was living with her grandmother, Plaintiff's grandfather physically and emotionally abused her every two or three days.

25. Plaintiff's grandfather preferred boys to girls, so he would pull Plaintiff's hair, sometimes drag Plaintiff to the ground by her hair, slap Plaintiff's face, kick Plaintiff's stomach, and beat Plaintiff with a stick or a belt.

26. In 2015, Plaintiff had a detached retina in her right eye because her grandfather hit her with a rolling pin.

27. Plaintiff was sexually harassed by a relative when she was in junior high school.

28. Plaintiff was sexually harassed by a man in Bishagang Park in Zhengzhou.

29. Plaintiff was diagnosed with Major Depressive Disorder.

30. Plaintiff attempted suicide three times as she got older.

31. Most suicide attempts were intentional drug overdoses, but one attempt included preparing to jump off a twenty-two (22) story building.

32. Despite struggling with depression, Plaintiff scored in the top 3% of approximately 10.2 million applicants on her national college entrance exam for Northwestern University in Henan, China.

33. Plaintiff placed first in admissions to the School of Software at Northwestern University.

34. Plaintiff was sexually harassed by a professor while at Northwestern University's School of Information Technology.

35. Plaintiff attempted suicide after the sexual harassment.

36. Despite struggling with depression and anxiety, Plaintiff was able to receive a bachelor's degree in Software Engineering from Northwest University in 2012.

37. Plaintiff graduated with a 3.2 GPA and was in the top 12% in her class.

38. When Plaintiff graduated from college, she needed to transfer her household registration back to her original hometown.

39. Plaintiff's stepmother did not allow Plaintiff to transfer her household registration back to Plaintiff's family's household registration.

40. Plaintiff had to settle in a collective household registration.

41. Plaintiff's stepmother was diagnosed with cancer.

42. Plaintiff's stepmother told Plaintiff that she was dying so she did not care about the law and would take Plaintiff with her.

43. Despite struggling with depression and anxiety, Plaintiff was able to receive a master's degree in Software Engineering from Yunnan University in 2016.

44. Plaintiff graduated with a 3.4 GPA and was in the top 15% of her class of 48 students.

45. While getting her master's degree at Yunnan University and shortly after graduating, she published multiple articles.

46. Plaintiff's published articles include the following:

    a. Ruoxue Wu, Wenjia Liu, Yuyuan Mao and Jeffrey Zheng. 2D Graphical Representation of DNA Sequences Based on Variant Map, IEEE Access, 2020, vol. 8, pp. 173755-173765.

    b. Wanghua Deng and Ruoxue Wu, Real-Time Driver-Drowsiness Detection System Using Facial Features, IEEE Access, 2019, vol. 7, pp. 118727-118738.

    c. Ruoxue Wu, Xiaoxuan Liang, Zhijie Zheng, Using Improved NIST for Visual Detection of Random Sequences of ZUC Algorithm (in Chinese), Application Research of Computers, 2018, vol.35(1): 253-256.

    d. Ruoxue Wu, Jeffrey ZJ Zheng, Xiaoxuan Liang, Visual Detection of Stream Cipher Sequences on ZUC Algorithm, CENet, 2017.

    e. Xiaoxuan Liang, Chao Yi, Ruoxue Wu, The Principle and Improvement of the Algorithm of Matrix Factorization Model Based on ALS, ISCC, 2015.

47. Plaintiff has tried to manage her symptoms with the help of a psychologist, medication, and a focus on exercise and eating well.

48. While at Yunnan University, she met her boyfriend, who would become an important part of her support network.

49. Plaintiff was employed as a Test Engineer and Product Manager for Shanghai Amarsoft Information Technology Co., Ltd after graduating from Yunnan University, and was a research assistant at Yunnan University as well.

50. Plaintiff wanted to study in the United States in the hopes that a change in environment would help her feel better.

51. Plaintiff also wanted to escape a stressful family environment.

52. Plaintiff applied to the Computer Science PhD program at WPI ("the Program"), and was accepted into the Program.

53. Plaintiff was awarded a Teaching Assistantship for the Fall 2021 and Spring 2022 semesters, which included a stipend of $23,868.00 paid out biweekly.

54. On or about July 26, 2021, WPI sent out a school-wide email notification stating student Jiyang "Jeffrey" Wu had died by suicide.

55. Plaintiff came to the United States on or about July 30, 2021.

56. Plaintiff lived with her boyfriend on weekends, but lived with her roommates during weekdays.

57. On or about August 18, 2021, WPI sent out a school-wide email notification stating student Lorenzo DeSimone had died by suicide on or about August 15, 2021.

58. Plaintiff and Lei Ma ("Defendant Ma") first met on August 20, 2021 for the first time at the dinner of their mutual friends.

59. In 2021, Defendant Ma was a third-year PhD student in the Computer Science program at WPI.

60. WPI's first day of classes was on or about August 25, 2021.

61. Plaintiff and Defendant Ma would sit next to each other in a lab they were both taking.

62. Plaintiff was assigned a post-doctoral advisor to help her with her research.

63. Plaintiff's post-doctoral advisor, Lei Cao ("Cao"), was from Massachusetts Institute of Technology.

64. Defendant Ma did not view Plaintiff getting a post-doctoral advisor from MIT as fair, as it would give Plaintiff an advantage in publishing in the future.

65. Defendant Ma told Plaintiff that she used to do programs alone.

66. Plaintiff learned that in 2019, Defendant Ma's first year at WPI, Defendant Ma was in another laboratory and had a poor relationship with her professor.

67. In Defendant Ma's first year at WPI, on WeChat, Defendant Ma would call senior students who received a bachelor degree in the United States "slackers".

68. Defendant Ma was forced to withdraw from the Chinese group text after it was discovered how Defendant Ma talked about other students on WeChat.

69. Defendant Ma was transferred to Plaintiff's professor's program in the second year of her PhD in 2020, during which, she did not have the guidance of a post-doctoral advisor.

70. After the death of the Lorenzo DeSimone, Defendant Ma asked Plaintiff how she felt.

71. On or about August 26, 2021, August 30, 2021, September 1-2, 2021, September 10, 2021, September 20-22, 2021, October 3, 2021, October 14, 2021, and October 17, 2021, Defendant Ma would ask asked Plaintiff questions about Plaintiff's mood and mental state.

72. Defendant Ma would ask Plaintiff questions like, "Why are you still in this situation?", "Why do you have depression?", and "You need to work on revising it quickly."

73. On or about September 15, 2021, Defendant Ma joined Plaintiff's project team.

74. On or about September 20, 2021, Plaintiff disclosed her Major Depressive Disorder diagnosis to Defendant Ma.

75. Pursuant to WPI's Student Code of Conduct, "WPI is committed to offering students a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making.

76. Pursuant to WPI's Student Code of Conduct, "[e]ach WPI student is responsible for reading and understanding WPI's expectations, which are documented in this Code. By enrolling

at WPI, students voluntarily agree to comply with the standards of performance and behavior described in this Code and in WPI's policies."

77. Pursuant to WPI's Student Code of Conduct "Engage Respectfully and Civilly with the Community" Section,

> WPI students will (i) recognize that they are part of a larger community and therefore their actions can enhance or detract from the experiences of others; (ii) treat fellow community members and guests with dignity, respect, and civility and create an environment where all students enable each other's excellence; (iii) respect the property and privacy of others; and (iv) inclusively value different identities, perspectives, opinions, and ideas.

78. Pursuant to WPI's Student Code of Conduct "Foster and Maintain Mature Interpersonal Relationships" Section, "WPI students will (i) foster the physical, mental, and emotional well-being of fellow community members and guests; (ii) be mindful of, advocate for, and foster a safe environment that supports their and others' welfare; and (iii) communicate respectfully, exhibit a spirt of cooperation, and resolve conflict appropriately."

79. Pursuant to WPI's Student Code of Conduct "Bias-Motivated Conduct" Section, "WPI does not tolerate conduct motivated in whole or in part by bias against an individual's perceived or actual race, sex, age, color, national origin, religion, genetic identity, disability, gender identity or expression, marital or parental status, sexual orientation, transgender status, veteran status, or any other legally protected status."

80. Pursuant to WPI's Student Code of Conduct "Conduct Negatively Impacting Community Well-Being" Section, "WPI expects that members of its community will not engage in behavior that compromises or negatively affects their or others' physical and mental health,

safety, academic progress, or professional responsibilities. For example, WPI prohibits behavior or interactions that can generally be perceived as uncivil, unprofessional or retaliatory towards others."

81. On or about September 22, 2021, Plaintiff began speaking with Matthew Barry ("Mr. Barry"), LMHC from WPI Student Development and Counseling Center, to discuss her depression and medication.

82. The topics discussed between Plaintiff and Mr. Barry included Plaintiff's depression and eating disorder, the pressures associated with being a first-year student at WPI, and problems with Plaintiff's family.

83. Plaintiff described Defendant Ma's behaviors to Mr. Barry, and asked Mr. Barry how to deal with this issue and how to adjust.

84. In subsequent weekly regular meetings with Mr. Barry, Plaintiff repeatedly explained the situation with Defendant Ma and asked for help.

85. Defendant Ma told Plaintiff she thought Plaintiff was stupid, was slow in reading papers, and would not do anything.

86. Defendant MA advised Plaintiff many times not to pursue a doctorate.

87. Defendant Ma said it was fine that Plaintiff had only received a master's degree.

88. Defendant Ma repeatedly told Plaintiff that she did not have the ability to successfully complete her PhD.

89. Defendant MA told Plaintiff she was not a hard worker, did not take her research seriously, and that Plaintiff was lazy.

90. Defendant Ma said that Plaintiff put on a show in scientific research, that she seemed to work hard, but actually did not put her heart into it, and that Plaintiff's time was wasted.

91. Defendant Ma told Plaintiff that if Plaintiff's bosses, post-doc advisor Cao and Professor Elke Rundensteiner ("Professor Rundensteiner"), knew about Plaintiff's depression, she would be kicked off of the project team named Anomaly Detection.

92. Defendant Ma repeatedly asked invasive questions about Plaintiff's depression and past.

93. Defendant Ma said that Plaintiff's depression was pretentious and that Plaintiff always lived in the past.

94. Defendant Ma said that everyone pursuing a PhD was under a lot of pressure, but no one else talked about it, Plaintiff was just whining.

95. Defendant Ma said she thought Plaintiff was using her mental illness as an excuse to ask for accommodation from others.

96. Defendant Ma said she thought it was Plaintiff's problem and asked Plaintiff to fix it.

97. Defendant Ma accused Plaintiff of faking her depression.

98. Defendant Ma told Plaintiff that she thought Plaintiff was hopeless.

99. On September 29, 2021, Plaintiff met with Mr. Barry again to talk about Defendant Ma.

100. Specifically, Plaintiff talked about how Defendant Ma would often scold Plaintiff, reprimand Plaintiff, and told Plaintiff that it was shameful that Plaintiff had depression and that Plaintiff should be ashamed of herself.

101. Plaintiff and Mr. Barry also discussed Plaintiff's mental health and history of depression which included the abandonment by Plaintiff's birth mother, disliked by her father and stepmother, physically beaten by her grandfather as well as her father and stepmother, including the incident where her grandfather detached Plaintiff's retina.

102. On October 6, 2021, Plaintiff met with Mr. Barry to discuss her feelings of isolation, and lack of trust in the other international Chinese students in the program.

103.     Defendant Ma talked about Plaintiff to Qian Wang ("Wang"), Defendant Ma's neighbor and a fellow PhD student in the Computer Science department at WPI.

104.     On October 7, 2021, Wang spoke with Plaintiff and asked her to keep her troubles to herself.

105.     Plaintiff asked Wang if Defendant Ma had told him about Plaintiff's depression, and Wang confirmed that Defendant Ma had told him.

106.     On October 13, 2021, Plaintiff met with Mr. Barry to discuss Defendant Ma and how Defendant Ma's words made Plaintiff feel miserable and have no self-esteem every day.

107.     The discussion between Plaintiff and Mr. Barry also included Plaintiff's mental health and her sleeping issues.

108.     On or about October 14, 2021, Defendant Ma referred to Plaintiff in her WeChat Moments.

109.     Plaintiff found that her mutual friends with Defendant Ma did not respond to Plaintiff and isolated Plaintiff socially after October 14, 2021.

110.     On October 17, 2021, Plaintiff sent a moment on WeChat.

111.     Plaintiff's October 17, 2021 moment post said the following:

> Being very subjective and one-sided to define something to force an evaluation a look through. So much output really made myself more serious. But in the end, I turned around and came back and I was blamed for being a bad person. My mistake is that I shouldn't have any response, I'm not humble enough to accept these outputs, so I'm the only one who has become the bad person I have to suffer no matter how harsh the word

is, I cannot argue. Everything has been defined. There is no middle ground, only absolute black and white. Forget it, I tried my best and the reality tells me that my true heart is indeed contemptuous.

112.     On the same day, Defendant Ma replied to this post publicly, but soon after deleted the message.

113.     Usually, when Plaintiff would post content related to her own mood in Moments, Defendant Ma would ask Plaintiff to delete them.

114.     In response to Plaintiff's Moment posted on October 17, 2021 Defendant Ma denied that Plaintiff had depression.

115.     Defendant Ma told Plaintiff if Cao, Plaintiff's advisor, found out about Plaintiff's depression, he would kick her out of the project group.

116.     Defendant Ma told Plaintiff it was shameful that Plaintiff was depressed.

117.     Plaintiff did not share information about her depression with her academic advisors or other members of the team out of fear of potentially being removed from her project group and losing her position in the program.

118.     Plaintiff began to notice that, after this post, her group of friends, which she shared with Defendant Ma, began ignoring her.

119.     Plaintiff began to feel increasingly isolated.

120.     Plaintiff was also working part time as a teaching assistant for the graduate level course Artificial Intelligence, taught by Professor Korkin.

121.     Defendant Ma made her believe Plaintiff's advisor, Cao, knew about Plaintiff's use of medication to manage her depression, and that this was going to make her lose her position as a research assistant in the project group.

122.     On October 17, 2021, while speaking to her advisor Cao, Plaintiff discovered Defendant Ma had told Cao about Plaintiff's depression.

123.     Cao also told Plaintiff that Defendant Ma had accused Plaintiff of "defaming" her.

124.     Plaintiff's situation led to a combination of depressed mood and excessive guilt.

125.     After Defendant Ma repeatedly telling Plaintiff that if Cao found out about Plaintiff's depression, Plaintiff would lose her position, and after learning Cao found out about Plaintiff's depression, Plaintiff believed she was going to lose her position in the project group.

126.     On or about October 18, 2021, Plaintiff was found in her apartment by her landlord.

127.     Plaintiff was found surrounded by pill bottles.

128.     Plaintiff's landlord called the police, and the police called an ambulance which took Plaintiff to UMass Lake Avenue Emergency Room.

129.     Plaintiff was admitted to UMass Lake Avenue Emergency Room on or about October 18, 2021.

130.     Plaintiff had attempted to commit suicide by ingesting 360 pills.

131.     Plaintiff took about 60 0.4mg pills of Xanax, 120 50mg pills of Fluvoxamine, and 180 60mg pills of Cymbalta.

132.     On October 18, 2021, Xiaoxuan Liang ("Mr. Liang"), Plaintiff's boyfriend, emailed and messaged Defendant Ma on WeChat.

133.     Mr. Liang's email to Defendant Ma detailed the damage she had done to Plaintiff's mental health.

134.     Defendant Ma responded to Mr. Liang saying she did not think of Plaintiff as "normal" because of her mental health issues.

135.     Defendant Ma stated she does not want to work with or talk to someone who is not normal.

136.     On or about October 20, 2021, Plaintiff's friends, Zhaolong Zhang and Bo Yang, contacted Cao and Professor Rundensteiner to report Defendant Ma's treatment of Plaintiff.

137.     On or about October 20, 2021 Mirabelle Tseng ("Ms. Tseng"), Assistant Director of International Student Life at the WPI International Student Center, contacted Plaintiff.

138.     Upon information and belief, Ms. Tseng is not a licensed counselor.

139.     On or about October 22, 2021, Plaintiff and Ms. Tseng talked on the phone regarding Defendant Ma's actions toward Plaintiff.

140.     Ms. Tseng asked Plaintiff why Plaintiff attempted suicide, which Plaintiff responded it was a result of Defendant Ma's behaviors.

141.     Mr. Barry and Tseng indicated Plaintiff would need to schedule a re-entry meeting upon discharge from the hospital and prior to resuming academics.

142.     On or about October 22, 2021, WPI was made aware that if Plaintiff was not allowed to return to WPI as a student and TA, Plaintiff would not be able to remain in the United States due to financial and visa-related reasons.

143.     On or about October 22, 2021, WPI was made aware that Plaintiff did not want to return to China due to an abusive and unsupportive family situation.

144.     On or about October 22, 2021, WPI acknowledged that Defendant Ma is not particularly kind or gentle in how she speaks to Plaintiff.

145.     On or about October 23, 2021, Plaintiff was transferred to McLean Hospital ("McLean").

146.     On or about October 28, 2021, McLean reached the conclusion that Plaintiff no longer required a secure, structured, inpatient, psychiatric setting in order to prevent harm and to assure safety.

147.     McLean acknowledged risk factors for Plaintiff, such as social isolation, language barrier, trauma history, history of multiple serious suicide attempts, a possible eating disorder, obsessive compulsive disorder, and/or borderline personality disorder.

148.     McLean determined that despite the presence of these risk factors, Plaintiff could be safely released to home with outpatient care because Plaintiff had a supportive partner, outpatient treatment, was oriented towards the future, as well as not having any active suicidal ideation.

149.     McLean determined that the risk of imminent harm to self or others was low.

150.     On or about October 28, 2021, Plaintiff was released from McLean.

151.     On or about October 28, 2021, Mr. Barry conducted a re-entry interview with Plaintiff.

152.     On or about October 29, 2021, Ms. Tseng had a Zoom call with Plaintiff.

153.     Ms. Tseng asked Plaintiff about her physical condition.

154.     Ms. Tseng told Plaintiff that Defendant Ma Lei was not willing to be with Plaintiff even if Plaintiff wanted to resume the project.

155.     Ms. Tseng told Plaintiff that she should contact her academic advisor, Professor Rundensteiner, as soon as possible, because Plaintiff needed to drop her research this semester.

156.     Ms. Tseng told Plaintiff that if she insisted on continuing, Plaintiff may not be able to finish the final.

157.    Ms. Tseng also talked with Plaintiff about Plaintiff's academic advisor Rundensteiner staggering Plaintiff's time with Defendant Ma.

158.    Ms. Tseng said that even if Plaintiff thought she could face Defendant Ma, Defendant Ma might not be able to face Plaintiff directly, and Ms. Tseng advised Plaintiff not to take the initiative to contact Defendant Ma or the other classmates in the lab and not to visit social media.

159.    Ms. Tseng also talked with Plaintiff about a re-entry meeting with SDCC teachers.

160.    Ms. Tseng told Plaintiff that she would like Plaintiff to visit Ms. Tseng every week or so if possible because there is no language barrier.

161.    On or about November 5, 2021, Ms. Tseng and Plaintiff frequently spoke over text.

162.    On or about November 5, 2021, Ms. Tseng and Plaintiff met on Zoom.

163.    Ms. Tseng asked Plaintiff whether she was thinking of suicide.

164.    Ms. Tseng would repeatedly ask Plaintiff if she was thinking of suicide without Plaintiff bringing up suicide.

165.    Ms. Tseng asked how Plaintiff felt about another WPI student who had recently committed suicide.

166.    Plaintiff let Ms. Tseng know that "When you're gone, no one will be mad at you," which was a reference to the custom of Plaintiff's hometown, that the dead are the greatest, meaning that no matter what they did before, people would never say anything bad about them after their death.

167.    On or about November 7, 2021, Plaintiff's roommate, Rui Cao, told Plaintiff that Defendant Ma had attempted to contact Rui Cao to say she had nothing to do with Plaintiff's suicide attempt.

168.     On or about November 7, 2021, Plaintiff's friend, Bo Yang, also said Defendant Ma tried to contact Bo Yang about Plaintiff's suicide attempt.

169.     Upon information and belief, Defendant Ma met with Professor Rundensteiner several times to indicate that she did not have anything to do with Plaintiff's suicide attempt.

170.     On or about November 8, 2021, Plaintiff had a re-entry meeting with Ms. Tseng and Emily Perlow ("Ms. Perlow"), Associate Dean of Students at WPI.

171.     During Plaintiff's re-entry meeting, Ms. Perlow requested that Plaintiff take a break from school, asked her to change project groups, and requested Plaintiff meet with a counselor at the Student Development Center every week.

172.     Ms. Perlow also told Plaintiff she would follow up on the actions taken by Defendant Ma towards Plaintiff.

173.     Plaintiff never received any follow up from Ms. Perlow about Defendant Ma's actions.

174.     On or about November 11, 2021, Plaintiff received an email from Perlow following up on their that took place on or about November 8, 2021 which stated;

Hello Ruoxue,

Thank you for meeting with me on Monday. I'm writing to summarize our conversation and to talk about next steps.

As we discussed and at your request, I explored some possible options with Elke regarding your continued work with the research group and your request to no longer work with Lei Ma. I would like to meet with you about some possible scenarios for your future research work. What is your availability for next week?

In your prior conversations with Mirabelle, you indicated that you planned to withdraw from directed research this term and focus on your other two courses for this term. I checked in Workday today and it does not appear that you withdrew from directed research. Do you intend to do so? I believe the deadline may be passed, but I can see if it's possible to do so retroactively.

How may I help you?

At our meeting, we discussed the importance of taking care of your health so that you are best positioned to succeed academically. We discussed that there are various options for pursuing your degree here at WPI, including:

the possibility of a medically approved reduced course load that allows you to focus on your health, take fewer courses, and can allow you to continue your TAship, which allows you to maintain your funding. As Mirabelle explained, this is possible to do and maintain your visa.

You also have the option of taking a leave of absence if you wish. In our conversation, you shared you hope to return to fulltime course work in January, but wanted to evaluate that at a later date.

I continue to be concerned about your overall personal safety and wellness. As we discussed when we met, your health matters far more than any course you may take. You agreed to maintain a regular relationship with a counselor and adhere to the expectations your counselor or psychiatrist may set forth for you. We also discussed how important it is for you to seek help from a professional counselor immediately if you are having thoughts about ending your life or harming yourself. Your counselor is the appropriate person and best equipped professional trained person for you to share these feelings.

WPI remains committed to your success. We want to see you complete your coursework and graduate from WPI. Yet, this commitment must be balanced with our responsibility to ensure that your well-being and the well-being of the rest of the community is not impacted.

I look forward to speaking with you further when you are ready.

Sincerely,

Emily

Emily Perlow, Ph.D.

Associate Dean of Students

Worcester Polytechnic Institute

100 Institute Road, Worcester, MA 01609

phone: 508.831.5060 fax: 508.831.5581

wpi.edu/campuslife

Pronouns: she, her, hers

175.     Plaintiff learned that Defendant Ma had attempted to contact Plaintiff's roommate again, on November 11, 2021, at 4:00 AM, to claim she did not have anything to do with Plaintiff's attempted suicide.

176.     Defendant Ma also posted on WeChat and implicated Plaintiff in her messages.

177.     On November 11, 2021, at 9:31AM, Plaintiff texted Ms. Tseng to express her frustration at Defendant Ma's lack of commitment to ending contact with Plaintiff.

178.     Plaintiff expressed a feeling of helplessness due to Defendant Ma's actions, indicating that Defendant Ma had not spared Plaintiff at all, was still shirking responsibility, and harassing people around Plaintiff.

179.     Plaintiff indicated she envied the four dead classmates, again referring to the custom of Plaintiff's hometown that the dead are the greatest, meaning that no matter what they did before, people would never say anything bad about them after their death, unlike the treatment Plaintiff was receiving from Defendant Ma.

180.     Upon information and belief, Ms. Tseng contacted the WPI student center to relay these texts to the Student Counseling Center.

181.     On November 11, 2021, at 10:00 AM, Plaintiff arrived at the WPI police station to wait for her attorney.

182.     Plaintiff planned to file a complaint against Defendant Ma at the WPI Police Station due to WPI's inaction.

183.     During this time, Ms. Tseng and Plaintiff continued texting each other.

184.     Ms. Tseng recommended that Plaintiff work on her homework in an empty classroom, to which Plaintiff said no.

185.     After Plaintiff and her attorney filed the complaint with WPI, Plaintiff returned home.

186.     When Plaintiff arrived home, Plaintiff found that a WPI police officer was waiting for Plaintiff at Plaintiff's residence at 7 Pratt St, Worcester, MA 01609.

187.     Plaintiff's apartment was not on WPI's campus.

188.     The WPI police officer told Plaintiff that Ms. Tseng said Plaintiff was going to kill herself.

189.     When the WPI officer asked Plaintiff what happened, Plaintiff explained what she had said to Tseng and told the officer she had a regular meeting with Mr. Barry that afternoon.

190.     The WPI officer requested Plaintiff come to the WPI Student Development Counseling Center to have a meeting with a counselor immediately, or he would remain to monitor her.

191.     Plaintiff felt that she had to go to SDCC in the morning in order not to get in trouble with the campus police.

192.     Plaintiff and her attorney met on the WPI campus with Charles C. Morse ("Mr. Morse"), the Associate Dean and Director of Counseling at the SDCC.

193.     Plaintiff and her attorney explained the misunderstanding with Ms. Tseng to Mr. Morse.

194.     Mr. Morse indicated he believed Plaintiff that Plaintiff was not a suicide risk.

195.     Mr. Morse indicated he believed Plaintiff's explanation for Plaintiff's text messages to Ms. Tseng and that there was a misunderstanding.

196.     The conversation between Plaintiff and Mr. Morse transitioned back to Plaintiff's continued studies.

197.     Mr. Morse gave Plaintiff the option of taking a semester break from campus or withdrawing from the program.

198.     Plaintiff refused both options and expressed her intention of continuing her studies.

199.     After Plaintiff refused to take a semester break from campus or withdrawing from the program, Mr. Morse then circled the conversation back to Plaintiff's mental health.

200.     Mr. Morse required Plaintiff to go to the hospital for a routine evaluation, not hospitalization.

201.     Mr. Morse told Plaintiff it was a process, and he wanted Plaintiff to cooperate.

202.     After inquiring if Plaintiff could go to a hospital in Boston for this evaluation, or a hospital near Amherst near Plaintiff's boyfriend, Mr. Morse declined the request, indicating it needed to take place at UMass Memorial.

203.     Around 12:00PM, a WPI Police officer escorted Plaintiff to the hospital and gave Plaintiff's nurse a brief explanation of what had occurred.

204.     Plaintiff was officially admitted into the hospital's emergency room around 5:00PM.

205.     On November 11, 2021, Mr. Liang, Plaintiff's boyfriend, messaged Ms. Tseng to request an update on the situation.

206.     Plaintiff's boyfriend explained it was a misunderstanding.

207.      Ms. Tseng informed Plaintiff's boyfriend that she was no longer allowed to be involved in the matter.

208.      On November 11, 2021, a member of the hospital staff, only identified as Cheryl, contacted WPI around 7:30pm.

209.      Cheryl indicated that Plaintiff had not signed a release, but Cheryl asked if WPI wanted to provide information about Plaintiff.

210.      WPI Counselor Phyllis Fitzsimmons ("Counselor Fitzsimmons") shared that Plaintiff had a serious suicide attempt and WPI was convinced that Plaintiff needed a much higher level of care.

211.      Staff at UMass Memorial told Plaintiff if she signed a release for the hospital to give information to WPI, Plaintiff would be released from the hospital.

212.      The social worker told Plaintiff it was a release to Plaintiff's counselor, Mr. Barry.

213.      However, the document the social worker gave to Plaintiff was not written in the name of Mr. Barry, so plaintiff could not sign it.

214.      After this discussion, UMass staff decided to admit Plaintiff under Massachusetts General Laws, Chapter 123, Section 12 and were looking for a bed for her.

215.      For six days, Plaintiff was placed in the emergency room hallway with bright lights and noise, which made it nearly impossible for Plaintiff to sleep.

216.      Plaintiff did not receive her medication on time, which caused a withdrawal reaction.

217.      During this time, Plaintiff did not receive medication for abdominal pain during menstrual period.

218.     Plaintiff contacted doctors and nurses about the medication, but Plaintiff did not receive help.

219.     Plaintiff was horrified by the self-mutilation and aggression of truly suicidal psychiatric patients in the emergency room.

220.     On November 16, 2021, Plaintiff was transported to McLean Hospital ("Defendant McLean") and was admitted under conditional voluntary status.

221.     Plaintiff submitted a notice of departure where she would leave after 72 hours.

222.     Without prior notice, on November 16, 2021, Ms. Perlow sent a letter to Plaintiff and Charles Morse, Director of Student Development and Counseling which stated;

Worcester Polytechnic Institute

Dean of Students

Division of Student Affairs

November 16, 2021

By Eletronic Mail, Federal Express Mail, And Fax

Ruoxue Wu

7 Pratt Street Apt #1

Worcester, Ma 01609


Dear Ruoxue,

This letter serves as confirmation of WPI's decision to place you on an Administrative Withdrawal from Worcester Polytechnic Institute (WPI) effective immediately. Pending completion of the requirements outlined in this letter, you will be eligible to return to WPI as soon as fall semester 2022.

This Administrative Withdrawal results from WPI's concerns for your personal safety and well-being. More specifically, you made an attempt on your life on October 18, 2021, and upon return to campus after your hospitalization, you have continued to make verbal statements and sent several text messages that intensified over the last week indicating persistent suicidal ideation. These statements then contributed to a second hospitalization.

In addition to WPI's concerns for your personal safety and well-being, your actions have disrupted the daily operations of the university and have been disruptive to the WPI community. Your fellow

students and faculty and staff at WPI have expressed a sincere desire to assist you during this time, yet your behavior and interactions with them have caused a great deal of concern and anxiety, as they have been usure of your personal safety. Further, you have not taken steps you stated you would take to withdraw from directed research following your October hospitalization. When options for reduced course load or a possible leave of absence were reviewed with you, you did not wish to consider these options.

Under these circumstances, we have concluded that ensuring your personal safety and well-being, as well as the safety and wellbeing of the WPI community, is well beyond our capabilities, resources and expertise.

As a result, you are being administratively withdrawn from the university. You may not visit WPI nor use any WPI facilities or resources, and your WPI computer accounts will be suspended.

To return to WPI, you must meet the following expectations:

To ensure that you continue to get the assistance you need, the university will require written assurance that you are getting the support recommended by your health care provider(s), such as a treatment plan with a licensed mental health provider. It is our expectation that your plan for self-care will not negatively affect other members of the WPI community and will prioritize your safety and personal well-being.

In order to return to WPI, you will need to provide satisfactory written confirmation from your health care provider(s) that you are prepared to return to WPI, resume a rigorous course of study and research, and live

508-831-5201 (TEL) 508-831-5581 (FAX)

_____

100 INSTITUTE ROAD, WORCESTER, MA 01609-2280 USA

WPI.EDU/+DSO

independently while continuing to support your safety and personal well-being. This documentation must include a written letter from your licensed mental health care provider(s) describing any relevant treatment you received, any ongoing treatment needs/concerns you may have upon your return to WPI, and a statement that specifically supports your return to WPI. Additionally, you must establish a plan for resuming directed research that supports your ability to successfully work with research group members. Upon WPI's determination that this documentation and any other information is satisfactory, you will be permitted to begin the process of reenrolling at WPI. It is our recommendation that you share the contents of this letter with your health care provider(s) so that they are family with the conditions for your return to WPI.

If you do re-enroll at WPI, in order to ensure that you continue to get the assistance that you need while at school, it is also required that you schedule a meeting with Charles Morse or a designee from the Student Development and Counseling Center at least one month before you plan to return to campus. This will assist Mr. Morse or his designee in assessing your ongoing mental health treatment needs/concerns while at WPI. Based on the results of this meeting, you will also be required to comply with the terms of the plan that will be established with you by the WPI Student Development and Counseling Center.

The university remains committed to your success and well-being. However, this commitment must be balanced with our responsibility to ensure your safety and the safety and well-being of the rest of the WPI community. Should you wish to return to the university, you must follow the process and directives outlined in this letter.

Please contact me if you have any questions or concerns,

Sincerely,

Emily Perlow

Associate Dean of Students


CC: Charles Morse, Director of Student Development and Counseling

223.    On November 17, 2021 at approximately 8:00 AM, Ms. Perlow, with the help of Ms. Tseng translating, contacted Plaintiff's father, who currently resides in China.

224.    Ms. Perlow, through Ms. Tseng, informed Plaintiff s father that, upon Plaintiff's release from McLean, staff from WPI would escort her to the airport and ensure she got on a return flight to China.

225.    Ms. Perlow, through Ms. Tseng, insisted Plaintiff return to China to get the support she needed and that Plaintiff would not be allowed to return back to the United States and to WPI until she proved she was able to handle the academic rigor of WPI's PhD program.

226.    Plaintiff never signed any release to share information with WPI, nor to share her medical information with her father.

227.    Hospitals staff at McLean Hospital SouthEast tried to get Plaintiff to sign a document revoking her three-day notice of intent to leave, which Plaintiff refused.

228.    While at McLean, Plaintiff was frightened by a patient getting agitated at 3:00AM and wanted to leave.

229.    Plaintiff asked for more food as she felt she was not getting enough to eat.

230.     Every time Plaintiff tried to ask for more food, the staff refused to give Plaintiff

any more, saying it was one serving per person.

231.     Without prior notice, on December 9, 2021, Colleen Callahan-Panday, PDSO and

Director of the Office of International Student Life at WPI sent Plaintiff a letter.

232.     The December 9, 2021 letter from Colleen Callahan-Panday stated:

Worcester Polytechnic Institute

Office of international student life

December 9, 2021

BY ELECTRONIC MAIL AND FEDERAL EXPRESS MAIL

Ruoxue Wu

520 Riverglade Dr. Apt J                    7 Pratt Street Apt #1

Amherst, MA 01002                          Worcester, MA 01609

Dear Ruoxue,

This letter serves as notification of WPI's termination of your F-1 SEVIS record.

On November 16, 2021, Worcester Polytechnic Institute's (WPI) Office of International Student Life was notified of your Administrative Withdrawal from WPI following Dean Perlow's notification to you.

By being placed on administrative withdrawal, you are no longer full-time enrolled at WPI, and this will affect your F-1 status. We are required to updated your F-1 SEVIS record when you are on administrative withdrawal. However, due to your hospitalization, WPI's Office of International Student Life delayed the termination of your F-1 status after your administrative withdrawal letter to help coordinate your safe return to your home country upon your release from the hospital.

On December 8, 2021, the WPI's Office of International Student Life received information which indicates that you are no longer hospitalized, and you have continued your stay in the United States despite your administrative withdrawal from WPI.

As of the date of this letter, WPI has terminated your F-1 SEVIS record due to authorized early withdrawal because you cannot maintain enrollment at WPI for the remainder of the semester due to your administrative withdrawal. You are required to depart the United States within 15 days of December 9, 2021. Students who are administratively withdrawn are not granted a 60-day grace period by USCIS.

Your current I-20 will no longer be valid and may not be used for future travel to the U.S. If you wish to return to WPI, you will need to apply for a new I-20 and you may need to pay a new SEVIS fee, in addition to the steps outlined in your November 16, 2021 administrative withdrawal letter.

Please contact WPI's Office of International Student Life with any questions about your immigration status.

Sincerely,

Colleen Callahan-Panday

PDSO and Director of the Office of International Student Life

508-831-6030 (TEL) 508-831-6032 (FAX)

_____

28 Trowbridge Road, Worcester, MA 01609-2216 USA

WPI.EDU

## COUNT I

### Violation of Title III of the Americans with Disabilities Act

### 42 U.S.C. § 12182, et seq

### (Defendant WPI)

233.    Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

234.    Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

235.    At all times relevant to this action, Plaintiff was an enrolled WPI student who had a disability, was regarded as having a disability, or had a record of a disability, and thus was a qualified individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

236.    At all times relevant to this action, WPI has been and is a "place of public accommodation" within the meaning of Title III of the ADA, as an undergraduate or postgraduate school, or other place of education. 42 U.S.C. § 12181(7)(J).

237.    Title III prohibits public accommodations from denying or affording an unequal opportunity to an individual or class of individuals with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

238.    Title III provides that goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

239.    Title III provides that an individual or entity shall not utilize standards or criteria or methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

240.    Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

241.     WPI has violated Title III of the ADA by denying Plaintiff, on the basis of disability, the opportunity to fully and equally enjoy, participate in, and benefit from WPI's goods, services, facilities, privileges, advantages, and accommodations.

242.     WPI has violated Title III of the ADA by executing involuntary administrative leave utilizing criteria and methods of administration that have the effect of discriminating against Plaintiff, a student with mental health disabilities, by tending to screen her out of, make it more onerous for her to regain access to, or completely deny campus services, facilities, privileges, advantages, and accommodations, on the basis of disability.

243.     WPI has violated Title III of the ADA by failing to make reasonable modifications to its leave of absence policies, practices, or procedures to ensure that Plaintiff has equal access to the benefits of WPI's goods, services, facilities, privileges, advantages, and accommodations.

244.     WPI has violated Title III of the ADA by failing to provide Plaintiff goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to her needs.

245.     WPI's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, WPI will continue to violate the ADA.

246.     WPI's conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

247.     Plaintiff is entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

248.     WHEREFORE, Plaintiff demands relief as set forth below.

**COUNT II**

**Violation of Section 504 of the Rehabilitation Act of 1973**

**29 U.S.C. § 794, et seq.**

**(Defendant WPI)**

249.    Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

250.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

251.    As an individual with a mental health disability or who has a record thereof or who has been regarded as having a disability, Plaintiff is a person with a disability within the meaning of Section 504. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20).

252.    As an admitted student, Plaintiff is otherwise qualified to participate in WPI's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

253.    As a university, WPI's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41.

254.    As an educational institution which permits students to pay education-related costs with the assistance of Federal grants and loans, and has done so at all times relevant to the claims asserted in this Complaint, WPI is a recipient of Federal financial assistance sufficient to invoke Section 504 coverage. 34 C.F.R. § 104.3(h).

255.    Section 504 implementing regulations promulgated by the Department of Education ("DOE regulations") provide that recipients of Federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate

against an otherwise qualified person with a disability by providing them with an opportunity to participate in or benefit from the aid, benefit, or service that is different, separate, not equal, or not as effective as that which is afforded others. 34 C.F.R. § 104.4(b)(1)(i)–(iv).

256.     DOE regulations further prohibit recipients of Federal financial assistance from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

257.     DOE regulations prohibit recipients of Federal financial assistance from utilizing criteria or methods of administration, including within its admission policies, that have an adverse effect on persons with disabilities, or that have the purpose or effect of defeating or substantially impairing accomplishment of the recipient's program or activity objectives with respect to qualified persons with disabilities. 34 C.F.R. §§ 104.4(b)(4), 104.42(b)(2).

258.     DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services. 34 C.F.R. § 104.43(a). See also 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

259.     DOE regulations require covered entities to operate their program or activity in the most integrated setting appropriate. 34 C.F.R. § 104.43(d).

260.     WPI has violated Section 504 by denying Plaintiff the benefits of its programs, services and activities on the basis of disability.

261.     WPI has violated Section 504 by maintaining rules, including eligibility criteria and methods of administration, that have the effect of discriminating against Plaintiff, a student with mental health disabilities, by tending to screen her out of maintaining student status and access to campus resources, on the basis of disability.

262.     As a proximate result of WPI's violations of Section 504 of the Rehabilitation Act, Plaintiff has been injured as set forth herein.

263.     Because WPI's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

264.     Plaintiff has no adequate remedy at law and unless the relief requested herein is granted, Plaintiff will suffer irreparable harm in that she will continue to be discriminated against and denied access to WPI's programs and services.

265.     Consequently, Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. § 794a(a)(2) & (b).

266.     WHEREFORE, Plaintiff demands relief as set forth below.

### COUNT III
### Declaratory Relief
### (Defendant WPI)

267.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

268.     An actual controversy has arisen and now exists between the parties in that Plaintiff contends, are informed, and believe that WPI denies that it is violating Title III of the ADA, Section 504 of the Rehabilitation Act, and related state laws, by excluding students with mental health disabilities from its programs and services and causing students with mental

health disabilities to be deterred from using Stanford services due to fear of being so excluded.

269.     A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

270.     WHEREFORE, Plaintiff requests relief as set forth below.

## COUNT IV
### Violation of Title XV of the Massachusetts Equal Rights Act
### M.G.L. c. 93 §103
### (Defendant WPI)

271.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

272.     Any person within the Commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.

273.     Chapter one hundred and fifty-one B defines the term "handicap" means (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment.

274. Implementing Article 114 to the Massachusetts Constitution, the equal rights law guarantees persons with disabilities (with reasonable accommodation) the same rights as other persons.

275. Article 114, which applies to all public and private entities in the Commonwealth regardless of funding, states, "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth."

276. A violation shall be established if, based upon the totality of circumstances, it is shown that any individual is denied any of the aforementioned protected rights.

277. As an individual with a mental impairment, or who has a record thereof, or who has been regarded as having a disability, Plaintiff is a person with a handicap within the meaning of Chapter one hundred and fifty-one B.

278. WPI has violated M.G.L. c. 93 §103 by excluding Plaintiff, an otherwise qualified handicapped individual, solely by reason of Plaintiff's handicap, from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth by placing Plaintiff on administrative withdrawal from WPI without conducting an individualized assessment with mental health professionals, that there was a significant risk that the Plaintiff will harm herself and that the risk cannot be eliminated though accommodations.

279. Consequently, Plaintiff is entitled to damages, as well as reasonable attorneys' fees and costs pursuant to M.G.L. c. 93 §103(d).

**COUNT V**

**Negligence**

**(Defendant WPI)**

280.  Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

281.  WPI was in a special relationship with Plaintiff due to the University-Student relationship.

282.  This special relationship gave rise to a duty for WPI to investigate, control, stop, or otherwise protect Plaintiff from conduct motivated in whole or in part by bias against an Plaintiff's perceived or actual disability, and prevent members of WPI's community from engaging in behavior that compromises or negatively affected Plaintiff's physical and mental health, safety, academic progress, and/or professional responsibilities, and from prohibiting behavior or interactions that can generally be perceived as uncivil, unprofessional or retaliatory towards Plaintiff.

283.  Defendant Ma also had a duty to refrain from conduct motivated in whole or in part by bias against Plaintiff's perceived or actual disability, and refrain from engaging in behavior that compromises or negatively affected Plaintiff's physical and mental health, safety, academic progress, and/or professional responsibilities, and refrain from behavior or interactions that can generally be perceived as uncivil, unprofessional or retaliatory towards Plaintiff.

284.  WPI failed to perform their duty, despite having knowledge of Defendant Ma's verbal and psychological abuse of Plaintiff, and that Plaintiff was subject to the continuous and relentless bullying of Defendant Ma.

285.  As a direct and proximate result of WPI's failure, and its negligent and careless acts and omissions, Plaintiff attempted suicide.

286.     As a direct and proximate result of Defendant Ma's negligent and careless acts and omissions, Plaintiff attempted suicide.

287.     WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT VI

### Gross Negligence

### (Defendant WPI)

288.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

289.     Despite having a special relationship with and duty to protect Plaintiff, WPI failed to observe even slight care and acted with utter indifference to the well-being of Plaintiff.

290.     As alleged more in-depth above, the WPI had knowledge of the effect Defendant Ma's verbal, mental, and emotional abuse of Plaintiff and Plaintiff informed WPI on multiple occasions.

291.     WPI failed to take action to stop or prevent the acts of Defendant Ma.

292.     Additionally, WPI were aware of the negative effect Defendant Ma's bullying was having on Plaintiff and her state of mind.

293.     Despite this knowledge, WPI failed to intervene, stop, or otherwise prevent Defendant Ma's conduct from continuing, despite their duty to intervene when a member of WPI's community engage in behavior that compromises or negatively affected Plaintiff's physical and mental health, safety, academic progress, and/or professional responsibilities, and from prohibiting behavior or interactions that can generally be perceived as uncivil, unprofessional or retaliatory towards Plaintiff.

294.     Defendant breached said duty by acting in a willful, wanton, reckless, and/or grossly negligent manner.

295.     Defendant, in its conduct, lacked the sufficient amount of care required for ordinary negligence.

296.     As a direct and proximate result of WPI's careless and indifferent breach of their duty, Plaintiff attempted suicide.

## COUNT VII
## Invasion of Privacy
## G. L. c. 214, Section 1B
## (Defendant Ma)

297.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

298.     On or about October 7, 2021, Defendant Ma unreasonably, substantially, and seriously interfered with Plaintiff's privacy by communicating private facts about Plaintiff's private medical information to other members of the WPI PhD Program.

299.     On or about October 7, 2021, Defendant Ma disclosed Plaintiff's private medical information to Qian Wang, another student in the WPI PhD Program.

300.     On or about October 17, 2021, Plaintiff learned that Defendant Ma informed Plaintiff's advisor Cao of Plaintiff's diagnoses of depression.

301.     Plaintiff's advisor, Cao, and students Qian Wang and Yiyang Zhao, were not aware of Plaintiff's diagnosis of depression before Defendant Ma.

302.     As a result of Defendant Ma's invasion of privacy by public disclosure of private facts, Plaintiff suffered personal humiliation and severe emotional distress, which contributed to Plaintiff's October 18, 2021 suicide attempt.

303.     WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT VIII

## Intentional Infliction of Emotional Distress
### (Defendant Ma)

304.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

305.     Between August 26, 2021 and November 11, 2021, Defendant Ma engaged in extreme and outrageous conduct with the intent to inflict emotional distress upon Plaintiff.

306.     Defendant Ma told Plaintiff she thought Plaintiff was stupid, slow in reading papers, did not have the ability to successfully complete her PhD, was not a hard worker, did not take her work seriously, and accused Plaintiff of faking her depression.

307.     Defendant Ma revealed Plaintiff's personal medical information to professors and students in WPI's PhD program after telling Plaintiff on numerous occasions that if anyone found out about Plaintiff's depression, Plaintiff would be kicked out of the PhD program.

308.     Defendant Ma's conduct caused plaintiff to suffer shock, great indignity, and severe emotional harm of a nature no reasonable person could be expected to endure, as a result of which Plaintiff suffered emotional damages which contributed to Plaintiff's October 18, 2021 suicide attempt.

309.     WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT IX
### Intentional Infliction of Emotional Distress
### (Defendant WPI)

310.     Plaintiff repeat, realleges, and incorporate herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

311.     Starting on or about November 11, 2021, WPI engaged in extreme and outrageous conduct with the intent to inflict emotional distress upon Plaintiff.

312.    As described above, after learning Plaintiff did not want to take a break from campus or withdrawing from the PhD program, WPI required Plaintiff to go to a hospital so she could be evaluated by telling Plaintiff she could check herself out when she wanted, and it was a routine evaluation, all while taking steps to ensure Plaintiff would be admitted to a hospital under M.G.L. c. 123 section 12.

313.    Further, while Plaintiff was hospitalized against her will, on or about November 16, 2021, WPI placed Plaintiff on Administrative Withdrawal, knowing that Plaintiff would not be allowed to remain in the United States due to the change in her immigration status, would be taken away from her boyfriend and support system, and be forced to return to China after originally leaving China to escape a stressful family environment.

314.    Defendant WPI's conduct caused plaintiff to suffer shock, great indignity, and severe emotional harm of a nature no reasonable person could be expected to endure, as a result of which Plaintiff suffered emotional damages.

315.    WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT X

## Breach of Contract

316.    Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

317.    Plaintiff and Defendants entered into an agreement that in exchange for WPI offering students a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making, by enrolling at WPI, students voluntarily agree to comply with the standards of performance and behavior described in the Student Code of Conduct and in WPI's policies.

318.     Defendant Ma failed to perform under the agreement by failing to comply with the "Engage Respectfully and Civilly with the Community", "Foster and Maintain Mature Interpersonal Relationships", "Bias-Motivated Conduct", and "Conduct Negatively Impacting Community Well-Being" Sections of the WPI's Student Code of Conduct by, including but not limited to, telling Plaintiff she thought Plaintiff was stupid, slow in reading papers, did not have the ability to successfully complete her PhD, was not a hard worker, did not take her work seriously, accused Plaintiff of faking her depression, and revealed Plaintiff's personal medical information to professors and students in WPI's PhD program after telling Plaintiff on numerous occasions that if anyone found out about Plaintiff's depression, Plaintiff would be kicked out of the PhD program.

319.     Defendant WPI failed to perform under the agreement by, including but not limited to, failing to provide a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making by failing to ensure Defendant Ma would comply with WPI's Student Code of Conduct and taking steps to ensure Plaintiff would be admitted to a hospital under M.G.L. c. 123, section 12 in order to place Plaintiff on administrative withdrawal from WPI.

320.     Defendants' actions constitute a material breach.

321.     Plaintiff has been damaged and continues to be damaged as a direct and proximate result of Defendants' material breach.

322.     WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT XI

## Breach of Covenant of Good Faith and Fair Dealing

323.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

324.     Defendants owed Plaintiff the implied duty of good faith and fair dealing by entering into the agreement outlined in WPI's Student Code of Conduct.

325.     Defendant Ma failed to perform her obligations under the enrollment agreement by, inter alia, by failing to comply with the "Engage Respectfully and Civilly with the Community", "Foster and Maintain Mature Interpersonal Relationships", "Bias-Motivated Conduct", and "Conduct Negatively Impacting Community Well-Being" Sections of the WPI's Student Code of Conduct by, including but not limited to, telling Plaintiff she thought Plaintiff was stupid, slow in reading papers, did not have the ability to successfully complete her PhD, was not a hard worker, did not take her work seriously, accused Plaintiff of faking her depression, and revealed Plaintiff's personal medical information to professors and students in WPI's PhD program after telling Plaintiff on numerous occasions that if anyone found out about Plaintiff's depression, Plaintiff would be kicked out of the PhD program.

326.     Defendant WPI failed to perform its obligations by, including but not limited to, failing to provide a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making by failing to ensure Defendant Ma would comply with WPI's Student Code of Conduct and taking steps to ensure Plaintiff would be admitted to a hospital under M.G.L. c. 123, section 12 in order to place Plaintiff on administrative withdrawal from WPI.

327.     Defendants' actions effectively destroyed and injured Plaintiff's contractual rights to receive a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making.

328.     Defendants breached the implied covenant of good faith and fair dealing with Plaintiff, by failing to perform its obligations under the agreement.

329.     Plaintiff has been damaged and continues to be damaged from Defendants' breach of the covenant of good faith and fair dealing.

330.     WHEREFORE, Plaintiff demands relief as set forth below.

## COUNT XII

### Promissory Estoppel

331.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

332.     Defendant WPI impliedly promised to provide with a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making.

333.     Defendant Ma impliedly promised to comply with WPI's Student Code of Conduct.

334.     Plaintiff reasonably and foreseeably relied to her detriment upon said promise by enrolling in WPI.

335.     Defendants knew or should have known that Plaintiff relied upon said promise when she enrolled in WPI.

336.     Plaintiff has been damaged as a direct and proximate result of said reliance as Defendants have failed to follow through on their implied promises.

337.     WHEREFORE, Plaintiff demands relief as set forth below.

## Count XIII

### Unjust Enrichment

### (Defendant WPI)

338.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

339.     Plaintiff conferred benefits upon Defendant WPI when WPI received Plaintiff's tuition.

340.     Defendant WPI had an appreciation or knowledge of said benefits conferred on it by Plaintiff.

341.     Notwithstanding said benefits, Defendant WPI failed to provide Plaintiff with a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making by failing to ensure Defendant Ma would comply with WPI's Student Code of Conduct and taking steps to ensure Plaintiff would be admitted to a hospital under M.G.L. c. 123, section 12 in order to place Plaintiff on administrative withdrawal from WPI.

342.     Defendant WPI's retention of said benefits occurs under circumstances that make such retention inequitable.

343.     Defendant WPI has been unjustly enriched by retaining said benefits.

344.     As a result of Defendant WPI's unjust enrichment, Plaintiff has been damaged and continues to be damaged.

## COUNT XIV

### Intentional Interference with Contractual Relations

### (Defendant WPI)

345.     Plaintiff repeats, realleges, and incorporates herein the allegations contained in the foregoing paragraphs as is each were set forth here and in its entirety.

346.     Defendant WPI intentionally interfered with an agreement between Plaintiff and the United States Government.

347.    The agreement between Plaintiff and the United States Government involved Plaintiff's F-1 Visa which required Plaintiff to be enrolled in a university program in the United States in order for Plaintiff to be allowed to remain in the United States.

348.    Knowing of the exclusive, binding contract between Plaintiff and the US Government and of the importance to that contract of Plaintiff remaining enrolled in a university program, Defendant WPI intentionally and/or maliciously interfered with Plaintiff's ability to maintain enrollment by involuntarily putting Plaintiff on administrative leave.

349.    Upon information and belief, Defendant WPI had an improper motive in placing Plaintiff on administrative leave with the intent of sending Plaintiff back to China so WPI would be relieved of responsibility for Plaintiff.

350.    As a result of Defendant WPI's intentional and/or malicious interference with Plaintiff's contract, Plaintiff was given 15 days to leave the United States.

351.    Plaintiff was forced to change her visa status to avoid being sent back to China.

352.    Plaintiff has been damaged and continues to be damaged as a direct and proximate result of Defendant WPI's actions.

353.    WHEREFORE, Plaintiff demands relief as set forth below.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

1. A declaration that WPI's conduct as alleged herein has violated and continues to violate the ADA, Section 504 of the Rehabilitation Act, and related state laws.

2. An order enjoining WPI and its employees, agents, and any and all other persons acting on WPI's behalf from violating the ADA, Section 504 of the Rehabilitation Act, and related state laws.

3. A permanent injunction pursuant to the ADA, Section 504 of the Rehabilitation Act, and related state laws requiring WPI to modify its policies and procedures to ensure that students with mental health disabilities have nondiscriminatory, full and equal access to academic, housing, health, insurance, and all other facilities, services and activities provided by WPI.

4. Enter judgment and award actual or statutory damages in favor of Plaintiff on Counts I - XIV in amounts to be determined at trial.

5. Award Plaintiff attorneys' fees and costs, as provided by statute.

6. Grant such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff claims and demands a jury trial in any court in which this action is tried.

Respectfully submitted,
Plaintiff,
By and through Counsel,

Dated: March 23, 2022

/s/ Kegan Moody
_____
Kegan Moody, Esq.
BBO#: 705674
Of Counsel
Blumsack and Canzano, P.C.
867 Boylston Street, 5th Floor
Boston, MA 02116
kegan@mybostonlawfirm.com
(401) 559-3371

## VERIFICATION

I, Ruoxue Wu, hereby declare under the pains and penalties of perjury that the factual allegations contained in this Verified Complaint are true and accurate to the best of my knowledge, information, and belief.

Dated: March 23, 2022

/s/ Ruoxue Wu

_____

Ruoxue Wu