UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

RUOXUE WU,

      Plaintiff,

      v.

LEI MA and WORCESTER POLYTECHNIC
INSTITUTE,

      Defendants.

Civil Action No. 22-30033-MGM

MEMORANDUM AND ORDER ON DEFENDANT
WORCESTER POLYTECHNIC INSTITUTE'S MOTION TO DISMISS
(Dkt. No. 12)

September 28, 2023

MASTROIANNI, U.S.D.J.

## I.   INTRODUCTION

Plaintiff, Ruoxue Wu, brings this action against Worcester Polytechnic Institute ("WPI" or "Defendant"),[1] alleging that actions Defendant took while Plaintiff was a student during the fall of 2021 unlawfully discriminated against her on the basis of disability and render Defendant liable to her under tort and contract/quasi-contract theories. (Dkt. No. 1.) Defendant's pending motion to dismiss asserts Plaintiff's claims all fail as a matter of law. (Dkt. No. 12.) For the reasons that follow, the court will allow Defendant's motion to dismiss.

---

[1] The court previously dismissed Plaintiff's claims against her former classmate, Lei Ma. (Dkt. No. 28.)

## II.    FACTUAL ALLEGATIONS[2]

Plaintiff was born and raised in China. She endured a difficult childhood. As an adult, she has struggled with anxiety and depression, so severe that she has made multiple serious suicide attempts. Despite these challenges, she achieved significant academic success in China. However, her familial relationships remained a source of stress and, hoping that she would feel better in a different environment, she sought opportunities to study in the United States. When she was around thirty-three years old, Plaintiff applied to the Computer Science PhD program at WPI. She was accepted into the program, awarded a Teaching Assistantship that paid $23,868 for the 2021-2022 academic year, and granted tuition funding for up to ten credits each semester. (Dkt. 1-3, Compl. Ex. A, WPI Admission Letter.) After Plaintiff confirmed her enrollment, WPI assigned her a post-doctoral advisor and an academic advisor. WPI also helped her obtain a student visa so she could legally study in the United States.

WPI is a university located in Worcester, Massachusetts and a recipient of federal financial assistance. All students, including graduate students, who enrolled at WPI during the 2021-2022 academic year, "voluntarily agree[d] to comply with the standards of performance and behavior" described in WPI's Student Code of Conduct ("Code of Conduct"). (Dkt. 1-4, Compl. Ex. B, WPI Student Code of Conduct Academic Year 2021-2022, 4.) In the Introduction to the Code of Conduct, WPI stated that it "is committed to offering students a nurturing, supportive, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making." (*Id.*) The Code of Conduct listed five "community standards" that WPI expected students to uphold, twenty-seven policies that "[s]tudents [were]

---

[2] At this stage in the litigation, the court accepts as true the factual allegations—those setting out who did or said what, to whom, and when—contained in the complaint and documents attached to the compliant. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008). While the court credits all factual allegations included in the lengthy Factual Background section and attached exhibits, only those relevant to her claims against Defendant are summarized here.

required to follow," and described the Resolution and Appeals Process ("RAP") that governed the reporting and resolution of complaints or allegations of misconduct.[3] (*Id.* at 4-22.)

A broad range of behaviors are addressed in the Code of Conduct. Two of the community standards articulated expectations that students would "engage respectfully and civilly with the community" and "foster and maintain mature interpersonal relationships." (*Id.* at 4-5.) WPI also had policies related to "Bias-Motivated Conduct" and "Conduct Negatively Impacting Community Well-Being." (*Id.* at 5-6.) The "Bias-Motivated Conduct" policy stated that "WPI does not tolerate conduct motivated in whole or in part by bias against an individual's perceived or actual . . . legally protected status," including disability. (*Id.* at 5.) The "Conduct Negatively Impacting Community Well-Being" policy stated: "WPI expects that members of its community will not engage in behavior that compromises or negatively affects others' physical and mental health, safety, academic progress, or professional responsibilities. For example, WPI prohibits behavior or interactions that can generally be perceived as uncivil, unprofessional or retaliatory towards others." (*Id.* at 6.) Anyone, including WPI itself, could submit a written complaint about an alleged violation of any community standards or policies and initiate the RAP. (*Id.* at 8, 11.) WPI viewed the RAP "primarily as an educational experience" and gave WPI conduct officers significant discretion to choose an appropriate resolution method based on the specifics of each complaint. (*Id.* at 13.) The five resolution methods typically used were: informal resolutions, restorative conferences, hearings, administrative agreements, and administrative decisions. (*Id.*)

Plaintiff arrived in the United States at the end of July and moved into an off-campus apartment in Worcester. On August 20, 2021, she met Lei Ma ("Ma"), a third-year student in the Computer Science PhD program, at a dinner hosted by mutual friends. Classes started several days after that dinner. Plaintiff and Ma sat next to each other during one lab and, a couple weeks later,

---

[3] A separate process governed reports or complaints involving sexual misconduct. (*Id.* at 12.)

Ma joined Plaintiff's research team. At some point after they met, Ma asked how Plaintiff felt about

a WPI student who had died by suicide earlier in August; the second of two WPI students who died

by suicide during the summer of 2021. Ma also asked Plaintiff about her mood and mental state.

Many of the questions were unsupportive and Ma often made unkind comments. She accused

Plaintiff of faking her depression, criticized Plaintiff's work ethic, said Plaintiff was lazy and

hopeless, and questioned Plaintiff's ability to do the work necessary to obtain a PhD.

Despite Ma's negative statements, Plaintiff continued to share personal information with Ma

and on September 20, 2021, Plaintiff disclosed to Ma that she had been diagnosed with Major

Depressive Disorder. At that time, Plaintiff had not shared information about her depression or

other mental health concerns, including her history of multiple serious suicide attempts, with her

advisors or other WPI employees. Ma responded with invasive questions and warnings that

Plaintiff's advisors would remove her from a research team if they learned about her depression.

On September 22, 2021, Plaintiff began speaking regularly with Matthew Barry ("Barry"), a

licensed mental health counselor from the WPI Student Development and Counseling Center.

During their meetings, they discussed several topics including Plaintiff's depression and eating

disorder, academic pressure, family problems, Plaintiff's feelings of isolation and her distrust of

other Chinese students in her program. Plaintiff also talked about her difficulties interacting with Ma

and asked Barry for help. She has not described any of Barry's responses or alleged that he provided

any advice regarding whether she should share information about her difficulties interacting with Ma

or her mental health issues with her academic advisors or other WPI employees.

Despite finding her relationship with Ma difficult, Plaintiff and Ma continued to move in the

same social circles and communicated regularly, including via postings on WeChat. In early October,

Plaintiff learned Ma had shared Plaintiff's diagnosis with another student in the Computer Science

PhD program after that student asked Plaintiff "to keep her troubles to herself." (Dkt. 1, Compl.

¶ 103.) A week later, Ma mentioned Plaintiff in a WeChat post. Afterwards, mutual friends stopped responding to Plaintiff and she felt socially isolated. On October 17, 2021, Plaintiff discovered Ma had told Plaintiff's post-doctoral advisor about Plaintiff's depression and accused Plaintiff of defaming Ma.

The following day, October 18, 2021, Plaintiff attempted to commit suicide by ingesting several hundred pills. She was transported to the emergency room at UMass Memorial Hospital. She was admitted and five days later, she was transferred to McLean Hospital. On October 22, 2021, Mirabelle Tseng ("Tseng"), WPI's Assistant Director of International Student Life contacted Plaintiff. Tseng, like Plaintiff, speaks Mandarin as well as English. When they spoke, Plaintiff told Tseng she had attempted suicide in response to Ma's actions. That same day, two of Plaintiff's friends contacted Plaintiff's post-doctoral and academic advisors and informed them that Ma had been treating Plaintiff poorly. Plaintiff has not alleged that her friends, advisors, or she, herself, ever made a written complaint describing Ma's actions and alleging that those actions violated the Code of Conduct.

While Plaintiff remained hospitalized, Tseng and Barry told her she would need to schedule a re-entry meeting after her discharge from the hospital before she could resume her academic program. WPI was aware that if Plaintiff was not permitted to return to WPI as a student and teaching assistant, she would not be able to remain in the United States for reasons related to finances and her student visa. Plaintiff was discharged from the hospital on October 28, 2021 and Barry conducted a re-entry interview with her that same day.

Plaintiff and Tseng spoke the following day over Zoom. Tseng told Plaintiff that she would not be able to resume her research project because Ma was unwilling to continue working with her. Tseng also told Plaintiff that her academic advisor would stagger the schedule so Plaintiff would not need to interact with Ma. Tseng encouraged Plaintiff not to initiate contact with Ma, or other

5

classmates in the lab, and not to visit social media. Tseng also advised Plaintiff to drop her research because Plaintiff might not be able to finish the final. After observing that there was no language barrier between herself and Plaintiff, Tseng told Plaintiff that she would like to meet with Plaintiff weekly.

Plaintiff and Tseng met again, over Zoom, on November 5, 2021. Although Plaintiff did not bring up suicide during that meeting, Tseng asked Plaintiff whether she was thinking about suicide and asked how Plaintiff felt about another WPI student who had recently committed suicide.[4] Plaintiff responded: "When you are gone, no one will be mad at you." (Dkt. 1, Compl. ¶ 166.) In her Complaint, Plaintiff explained that her words referenced a custom in her hometown of never saying anything bad about those who have died, no matter what they did while living, but did not allege sharing that explanation with Tseng.

On November 8, 2021, Plaintiff met with Tseng and Emily Perlow, WPI's Associate Dean of Students. During that meeting, Perlow requested Plaintiff take a break from school, change project groups, and meet weekly with a counselor at the Student Development and Counseling Center (SDCC). Perlow also said she would follow up about Ma's actions towards Plaintiff.

Three days later, on November 11, 2021, Perlow sent Plaintiff an email summarizing the topics discussed during their meeting. Perlow wrote that she had explored some options for Plaintiff's future research work and wanted to discuss the possibilities with Plaintiff. She also expressed surprise that Plaintiff was still enrolled in directed research because Perlow understood that Plaintiff had agreed to withdraw and focus on her other two classes. Perlow reminded Plaintiff that they had "discussed the importance of taking care of your health so that you are best positioned to succeed academically" and options for Plaintiff to continue her studies at WPI. (*Id.* at ¶ 174.) She

---

[4] Tseng's comment appears to be a reference to a third student who had died by suicide, but no other details were included in the Complaint.

described two of those options in the email. Under the first option, Plaintiff would take a medically approved reduced course load that would allow her to focus on her health while also maintaining her teaching assistantship, funding, and student visa. The second option was for Plaintiff to take a leave of absence and later return to fulltime course work, perhaps as early as January.

After describing Plaintiff's two options, Perlow reiterated her concern about Plaintiff's personal safety and wellness. She recalled Plaintiff's agreement to maintain a regular relationship with a counselor and adhere to the counselor's expectations. Perlow also reminded Plaintiff "how important it is for you to seek help from a professional counselor immediately if you are having thoughts about ending your life or harming yourself" and noted that Plaintiff's counselor was "the appropriate person and best equipped professional" with whom to share such feelings. (*Id.*) Perlow concluded by renewing WPI's commitment to Plaintiff's success and explaining that WPI had to balance that commitment with "our responsibility to ensure that your well-being and the well-being of the rest of the community is not impacted." (*Id.*)

The same day Perlow sent her email, Plaintiff sent texts to Tseng expressing frustration with Ma's conduct. On several occasions, including earlier that morning, Ma had contacted Plaintiff's friends and roommate to assert that she had nothing to do with Plaintiff's suicide attempt. Plaintiff's text messages to Tseng expressed feelings of helplessness and stated that she envied four dead classmates.[5] In her complaint, Plaintiff explained that she was referencing her hometown's tradition of reverence for the dead, but she did not allege providing that context in her text messages. Tseng shared the texts with the SDCC and continued to text with Plaintiff. During this same time, Plaintiff, apparently without informing Tseng, arrived at the WPI police station, where she met her attorney and filed a complaint against Ma. After filing the complaint, Plaintiff, still accompanied by

---

[5] Plaintiff's Complaint did not explain Plaintiff's reference to four (as opposed to two or three) deceased WPI students.

her attorney, returned to her off-campus apartment. A WPI police officer was waiting for her and informed her that Tseng was concerned Plaintiff was planning another suicide attempt. In response to a question from the officer, Plaintiff explained the texts she had sent to Tseng. She also told the officer she had a regularly scheduled meeting with a counselor that afternoon. The officer requested Plaintiff accompany him to the SDCC for an immediate meeting with a counselor and stated that if she refused, he would remain to monitor her.

In order to avoid trouble with the campus police, Plaintiff and her attorney, returned to the WPI campus. At the SDCC, they met with Charles Morse, Associate Dean and Director of Counseling. They explained that Tseng had misunderstood Plaintiff's statements. Morse stated that he understood Plaintiff's explanation, agreed there had been a misunderstanding, and believed Plaintiff was not currently at risk of attempting suicide.

Morse then addressed the issue of Plaintiff's continued studies and advised Plaintiff that she could take a semester break from campus or withdraw from the PhD program. Plaintiff declined both options and expressed that she wished to continue her studies. Morse informed Plaintiff that she would need to be evaluated at the hospital and asked her to cooperate with the process. She suggested she be evaluated at a hospital in Boston or at a hospital close to Amherst, where her boyfriend lived. Morse indicated the evaluation needed to take place at UMass Memorial Hospital in Worcester, the same hospital where Plaintiff was initially hospitalized after her suicide attempt.

The WPI police officer accompanied Plaintiff to the hospital and explained the situation to a nurse. After approximately five hours, Plaintiff was admitted into the hospital's emergency room around 5:00 PM. A hospital employee contacted WPI around 7:30 PM, indicated that Plaintiff had not signed a release, and asked if WPI wished to provide information about Plaintiff. A member of the WPI counseling staff informed the hospital employee that Plaintiff had recently made a serious suicide attempt and WPI believed Plaintiff required a higher level of care. Hospital staff informed

Plaintiff that if she would sign a release allowing the hospital to provide information to WPI, Plaintiff would be discharged. Plaintiff was told the release would allow the hospital to share information with Barry, but the release she was given to sign was not limited to Barry and Plaintiff declined to sign the release.

Later, the hospital admitted Plaintiff pursuant to Mass. Gen. L. c. 123, § 12, which allows an individual to be involuntarily admitted to a psychiatric unit for up to three business days. Plaintiff was placed in a brightly lit emergency room hallway. She remained there, uncomfortable and without proper access to necessary medications, until she was transferred to McLean Hospital on November 16, 2021. She was admitted to McLean under conditional voluntary status and notified McLean that she would depart from the hospital after 72 hours.

Also on November 16, 2021, Perlow sent Plaintiff a letter notifying her that she had been administratively withdrawn from WPI, summarizing WPI's views regarding recent events, and advising Plaintiff about the steps she would need to complete in order to be readmitted in the fall of 2022. Perlow noted Plaintiff's October 18, 2021 suicide attempt and explained that since returning to campus, Plaintiff had "continued to make verbal statements and sent several text messages that intensified over the last week indicating persistent suicidal ideation" and that the statements had contributed to Plaintiff's second hospitalization. (Compl., Dkt. No. 1, at ¶ 222.) Perlow wrote that WPI had concerns about Plaintiff's well-being, the disruption her actions had caused to WPI's other students, faculty, and staff, and her refusal to withdraw from her directed research or reduce her course load after her first hospitalization. Based on these concerns, Perlow stated that WPI had concluded it was "well beyond [WPI's] capabilities, resources, and expertise" to ensure the safety and well-being of Plaintiff and the WPI community. (*Id.*)

The next day, Perlow, with translation assistance from Tseng, contacted Plaintiff's father in China. Although Plaintiff had not signed a release allowing her medical information to be shared

with WPI or for WPI to share such information with her father, Perlow notified him that after Plaintiff was released from McLean, staff from WPI would accompany her to the airport and ensure she got on a flight back to China. Perlow also informed Plaintiff's father that Plaintiff would not be able to return to WPI until she could prove that she was able to handle the academic rigor of the WPI PhD program.

Staff at McLean tried to convince Plaintiff to revoke her notice of intent to leave, but Plaintiff did not do so and checked herself out after seventy-two hours. WPI did not learn that Plaintiff was no longer hospitalized until December 8, 2021. The following day, the director of WPI's Office of International Student Life sent a letter to Plaintiff explaining that WPI was required to update Plaintiff's visa status after she was administratively withdrawn, had delayed entering the update while she was hospitalized, but had now terminated her visa status. The letter informed Plaintiff that she was required to depart the United States within fifteen days.

### III.   DISCUSSION

The claims Plaintiff asserts against Defendant fall into three groups: disability discrimination claims, tort claims, and contract/quasi-contract claims. She has alleged Defendant's actions towards her after her October 2021 suicide attempt constituted discrimination on the basis of her mental health disability in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, *et seq* ("ADA") (Count I), Section 504 of the Rehabilitation Act of 1972, 29 U.S.C. § 794, *et seq* ("RA") (Count II), and Title XV of the Massachusetts Equal Rights Act, Mass. Gen. Laws c. 93, § 103 ("MERA") (Count IV).[6] Her tort claims allege Defendant's failure to protect Plaintiff from Ma's conduct constituted negligence (Count V) or gross negligence (Count VI) and Defendant's unilateral

---

[6] In Count III, Plaintiff requested declaratory relief for alleged violations of the ADA, RA, and MERA. As declaratory relief is a remedy, rather than an additional basis for liability, the court does not separately address Count III.

10

decisions to place Plaintiff on administrative withdrawal and change her visa status constituted intentional infliction of emotional distress (Count IX) and intentional interference with contractual relations (Count XIV). Finally, Plaintiff has asserted claims for breach of contract (Count X), breach of the covenant of good faith and fair dealing ( Count XI), promissory estoppel (Count XII) and unjust enrichment (Count XIII) because Defendant did not provide her with the type of nurturing and supportive learning environment described in the Code of Conduct. Defendant has argued that dismissal is appropriate as to all of Plaintiff's claims because her factual allegations are insufficient to state any claims upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

A.    Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). Dismissal is appropriate if the complaint fails to establish at least one "material element necessary to sustain recovery under some actionable legal theory." *N.R. by and through S.R. v. Raytheon Co.,* 24 F.4th 740, 746 (1st Cir. 2022) (internal quotations omitted).

B.    Discrimination Claims

At the federal level, the ADA, and its precursor, the RA, both "prohibit discrimination against an otherwise qualified individual based on his or her disability." *Calero-Cerezo v. U.S. Dep't of*

11

*Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Though there are some differences between the two statutes, "[c]ase law construing the ADA generally pertains equally to claims under the [RA]." *Id.* In Massachusetts, Article 114 of the Amendments to the Massachusetts Constitution grants an "otherwise qualified handicapped individual" the right to be free from discrimination that is "solely by reason of [the individual's] handicap" and Article XV of the MERA, Mass. Gen. Laws c. 93, § 103, allows actions to enforce that right. *Carlton v. Commonwealth*, 858 N.E.2d 258, 272-73 (Mass. 2006). Courts applying the MERA typically give terms used in Article 114 meanings that are consistent with the RA. *Shedlock v. Dept. of Correction*, 818 N.E.2d 1022, 1031 (Mass. 2004). For purposes of its motion to dismiss, Defendant concedes that Plaintiff has adequately alleged she was a qualified disabled individual, but argues that she has not adequately alleged that Defendant discriminated against her because of her disability.[7]

The distinction between factual allegations and conclusory statements is especially relevant to Plaintiff's claims that Defendant's actions violated the ADA, RA, and MERA. In each count, she alleged generally that Defendant acted in ways that violated statutory and regulatory language, but only identified a few examples of discriminatory conduct. *See Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90, 94 (1st Cir. 2000) (determining from a close examination of the complaint that the only discriminatory conduct actually alleged by plaintiffs was insufficient to support their ADA claim). Additionally, the few specific discriminatory actions Plaintiff attributed to WPI did not match up with the factual allegations she set forth earlier in the Complaint.[8] While the court credits

---

[7] Defendant has not challenged the sufficiency of Plaintiff's allegations as to other necessary elements. The court, therefore, accepts, without further discussion, that Title III of the ADA applies because WPI is a place of public accommodation, *G. v. Fay School*, 931 F.3d 1, 9 (1st Cir. 2019); the RA applies because WPI receives federal financial assistance, *Lesley v. Hee Man Chie*, 250 F.3d 47, 52–53 (1st Cir. 2001); and the MERA applies because no other statutory remedy is available under Massachusetts law, *Carlton*, 858 N.E.2d at 272-73.
[8] The reason for the mismatch between Plaintiff's factual allegations and the framing of her legal claims appears to be that Plaintiff borrowed significant portions of her disability claims from a complaint filed against another university and supported by different factual allegations. In *Mental Health & Wellness Coalition, et al. v. The Board of Trustees of the Leland Stanford Junior University*, (No. 5:18-cv-02895-NC (N.D.Cal.) (complaint

Plaintiff's factual allegations and the inferences that can reasonably be drawn from them, it does not credit rote recitals that Defendant's cumulative actions violated statutory obligations or conclusory statements that are not supported by specific factual allegations. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013) (dismissing complaint where "only relevant factual allegation" was insufficient to support claim once conclusory statement that conduct met element of claim was disregarded).

Plaintiff's only specific allegations in Count I were that "WPI has violated Title III of the ADA by executing involuntary administrative leave utilizing criteria and methods of administration that have the effect of discriminating against Plaintiff" and "by failing to make reasonable modifications to its leave of absence policies, practices, or procedures." (Compl., Dkt. 1 ¶¶ 242-43.) She was even more vague in Count II asserting only that WPI had violated the RA by "maintaining rules, including eligibility criteria and methods of administration," that had a discriminatory effect on Plaintiff by "tending to screen her out of maintaining student status and access to campus resources, on the basis of disability." (*Id.* at ¶ 261.) Yet, Plaintiff has not identified any criteria or policies WPI used when making decisions about her student status, preventing any assessment of whether such criteria or policies were discriminatory when applied to students with mental health disabilities. There is also no factual basis for the court to infer that WPI had a pattern of placing students with mental health disabilities on administrative withdrawal because Plaintiff's allegations are limited to her own experience. Without such allegations, the court cannot reasonably infer that WPI took any actions towards Plaintiff as a result of discriminatory criteria or policies.

---

(Dkt. No. 1) filed May 17, 2018), several students and mental health advocates claimed Stanford University had a policy or practice of responding to all student mental health emergencies by immediately placing the student on voluntary leave status. By contrast, in this case, Plaintiff has recounted only her personal experience and provided no basis for inferring that WPI responded to her situation by rigidly applying a discriminatory policy, rather than making an individualized evaluation. The court further notes that the Stanford case was settled prior to any substantive rulings.

In her MERA claim, Plaintiff described WPI's discriminatory conduct as "placing Plaintiff on administrative withdrawal from WPI without conducting an individualized assessment with mental health professionals, that there was a significant risk that Plaintiff will harm herself and that the risk cannot be eliminated through accommodation." (Compl., Dkt. 1 ¶ 278.) However, this description of WPI's conduct does not accurately summarize Plaintiff's own allegations. Most notably, WPI did not place Plaintiff on administrative withdrawal until after she was individually examined by medical professionals at an independent hospital and they determined that she needed to be involuntarily admitted. The decision was made, and Plaintiff was hospitalized for a second time, just two weeks after she was discharged from the ten-day hospitalization that followed her serious suicide attempt. Despite Plaintiff's assertions to the contrary, none of her allegations support an inference that WPI provided inaccurate information or improperly influenced the hospital's decision to admit Plaintiff. Her allegations that she did not require the hospitalization and was traumatized by the experience do not alter this assessment because she has not plausibly alleged that Defendant was aware of, or bears any responsibility for, those harms.

Additionally, her allegations establish that WPI proactively offered Plaintiff accommodations after her first hospitalization that would have lightened her academic load while maintaining her income and visa status. However, she did not follow-through with reducing her course load and did not propose alternative accommodations. Around the same time, she shared positive views about death with Tseng on two occasions, apparently without awareness or concern as to how the statements might be perceived given the context of her recent suicide attempt. Though she now asserts that the statements were misunderstood, she has not alleged any facts from which the court could conclude WPI's response – requiring her to submit to an independent mental-health evaluation – was discriminatory. *Cf. Buchanan v. Maine*, 469 F.3d 158, 176 (1st Cir. 2006) (explaining that a medical treatment decision can only be challenged under the ADA and RA if it was "based on

stereotypes of the disabled rather than an individualized inquiry" or was so unreasonable as to suggest a discriminatory motive).

Having fully considered Plaintiff's description of the events leading up to WPI's decision to place her on administrative withdrawal, and drawing all reasonable inferences in Plaintiff's favor, the court finds she has not plausibly alleged that WPI's conduct was discriminatory. Defendant's motion to dismiss is, therefore, granted as to Plaintiff's ADA, RA, and MERA claims.

C. Tort Claims

Defendant also contends Plaintiff's Complaint fails to support her claims that Defendant is liable to her for negligence (Count V), gross negligence (Count VI), intentional infliction of emotional distress (Count VII), and intentional interference with contractual relations (Count XIV). Plaintiff alleged Defendant was negligent and grossly negligent for failing to prevent Plaintiff's suicide attempt by intervening to protect Plaintiff from Ma's conduct towards her. She claimed Defendant's decision to place Plaintiff on administrative withdrawal constituted intentional infliction of emotional distress, because WPI was aware Plaintiff wished to remain enrolled, and intentional interference with contractual relations, because it negatively impacted her student visa.

1. Negligence and Gross Negligence

Plaintiff claims Defendant was negligent and grossly negligent for failing to protect her from Ma's conduct and that its failure caused Plaintiff to attempt suicide. "To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." *Jupin v. Kask*, 849 N.E.2d 829, 834-35 (Mass. 2006). For gross negligence, a plaintiff must also demonstrate that defendant's act or omission of a legal duty was of an aggravated character, not simply a failure to exercise ordinary care. *Aleo v. SLP Toys USA, Inc.*,

995 N.E.2d 740, 752 (Mass. 2013). Whether Defendant owed Plaintiff a duty of reasonable care with regard to her relationship to Ma is a question of law. *Jupin*, 849 N.E.2d at 232. Plaintiff claims the university-student relationship that existed between herself and Defendant was a special relationship that imposed a duty on Defendant to intervene and protect Plaintiff from Ma's conduct. The court disagrees.

While "[u]niversities are clearly not bystanders or strangers in regards to their students," they also "are not responsible for monitoring and controlling all aspects of their students' lives." *Nguyen v. Mass. Inst. of Tech.*, 96 N.E.3d 128, 140-41 (Mass. 2018). This is especially true with respect to graduate students, like Plaintiff, who "are adults in all respects under the law." *Id.* at 141. While universities used to stand in loco parentis toward their students, "the modern university-student relationship is respectful of student autonomy and privacy." *Id.* To the extent universities owe a duty to their students, "that duty . . . is not one of a general duty of care." *Id.*

Under Massachusetts law, a university has a special "duty to take reasonable measures under the circumstances" to prevent a student's suicide if it "has actual knowledge of a student's suicide attempt that occurred while enrolled . . . or recently before matriculation, or of a student's stated plans or intentions to commit suicide" *Id.* at 142-43. Defendant almost certainly owed Plaintiff this type of special duty when she returned to campus following her first hospitalization. However, Plaintiff's negligence and gross negligence claims are based on Defendant's failure to take actions before she attempted suicide and there is no basis for finding Defendant owed Plaintiff any special duty during that period. Although Plaintiff had previously attempted suicide before enrolling at WPI, she has not alleged when those attempts occurred, and her allegations do not suggest Defendant had any reason to know about those earlier suicide attempts. At all relevant times, Plaintiff and Ma were adults and academic peers. While they shared a lab and later were in the same research group, they originally met through mutual friends and chose to communicate extensively

16

using social media platforms outside WPI's control. Although Plaintiff shared concerns about their interactions with her counselor at WPI before her suicide attempt, she did not submit a complaint about Ma's behavior until afterwards. The court, therefore, concludes Plaintiff's complaint fails to state claims for negligence or gross negligence.

2. Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress requires a plaintiff "to show (1) that [the defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014). To qualify as "extreme and outrageous" conduct must go "beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotations omitted). Dismissal is appropriate when the conduct alleged in the complaint does not satisfy that high standard. *Id.*

Plaintiff's allegations do not come close to meeting this standard. As explained above, when Plaintiff's conclusory statements are disregarded, the remaining factual allegations show WPI's decision to require Plaintiff to undergo an independent mental health evaluation was reasonable given Plaintiff's recent suicide attempt, refusal to accept offered accommodations, and positive statements about death. None of the facts set forth in Plaintiff's complaint are consistent with her suggestion that WPI improperly influenced the decision hospital staff made to admit her involuntarily or unreasonably relied on that decision when placing her on administrative withdrawal. For these reasons, Defendant's motion to dismiss is granted as to Plaintiff's claim for intentional infliction of emotional distress.

3.   Intentional Interference with Contractual Relations

Plaintiff's final tort claim asserted Defendant's decision to place Plaintiff on administrative

withdrawal was an intentional interference with a contractual relationship between Plaintiff and the

United States government because it negatively impacted Plaintiff's student visa status. "In an action

for intentional interference with contractual relations, the plaintiff must prove that (1) [s]he had a

contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the

defendant's interference, in addition to being intentional, was improper in motive or means; and (4)

the plaintiff was harmed by the defendant's actions." *Harrison v. NetCentric Corp.*, 744 N.E.2d 622,

632 (Mass. 2001). Without first deciding whether Plaintiff's student visa created a contract between

her and the United States government, the court dismisses Plaintiff's claim for intentional

interference with contractual relations because, for the reasons discussed above, Plaintiff's factual

allegations do not support an inference that WPI had an improper motive or used improper means

when it placed Plaintiff on administrative withdrawal.


D.   Contract and Quasi-Contract Claims

1. Breach of Contract

In Count X, Plaintiff alleged the Code of Conduct created a contractual relationship and

Defendant breached the terms of that contract by "failing to provide a nurturing, supportive,

collaborative, and positive learning environment encouraging the active exchange of ideas, deep

reflection, and sound decision making" and failing to ensure that Ma complied with the Code of

Conduct. (Dkt. 1, Compl. ¶ 319.) The parties agree that the Code of Conduct is similar to a student

handbook and, under Massachusetts law, a student handbook can contain terms that are

contractually enforceable. *G. v. Fay School*, 931 F.3d 1, 12 (1st Cir. 2019). "To determine whether select

terms of a student handbook are contractually enforceable, Massachusetts courts employ the

standard of reasonable expectation, that is, what meaning the party making the manifestation . . . should reasonably expect the other party to give the terms." *Id.* (internal quotations omitted). "A breach of contract is established if the facts show that the university has 'failed to meet [the student's] reasonable expectations.'" *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61–62 (1st Cir. 2016) (quoting *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 378 (Mass. 2000)). However, "[v]ague and generalized representations are not contractually enforceable." *Fay School*, 931 F.3d at 12.

While there are portions of the Code of Conduct that contain the type of well-defined procedures that form contractual promises, the introductory language describing WPI's commitment "to offering students a nurturing, collaborative, and positive learning environment encouraging the active exchange of ideas, deep reflection, and sound decision making," is the type of "generalized, aspirational statements that are insufficiently definite to form a contract." *Id.* Similarly, the list of community standards and policies provide important information about the Defendant's expectations regarding student behavior without making any specific promises about how WPI would respond if a student did not meet expectations. Even in the more detailed RAP section, the Code of Conduct explains that WPI employees had discretion to decide on an appropriate resolution method. Only the most formal methods are described in sufficient detail to form contractual promises regarding their implementation. Since Defendant would not reasonably have expected its students to interpret the Code of Conduct as a promise that WPI would ensure all students consistently met all its aspirational expectations, the court dismisses Plaintiff's breach of contract claim.

2. Breach of Covenant of Good Faith and Fair Dealing

Plaintiff has also asserted a claim for breach of the covenant of good faith and fair dealing (Count XI). A covenant of good faith and fair dealing is implied in every contract. *T.W. Nickerson,*

*Inc. v. Fleet Nat. Bank*, 924 N.E.2d 696, 703 (Mass. 2010). Though Defendant contested the terms of the contract created by the Code of Conduct, it agreed that the parties had a contractual relationship. "The scope of the covenant of good faith and fair dealing is shaped in each context by the nature of the contractual relationship." *Id.* at 706. Plaintiff claims that, regardless of the specific terms of their contract, the implied covenant barred Defendant from taking actions that would interfere with her ability to remain a WPI student and Defendant violated the covenant by creating the conditions that led to her second hospitalization in order to justify placing her on administrative withdrawal. The claim fails for two reasons. First, such a broad covenant is inconsistent with the much more limited terms of the Code of Conduct. Second, as discussed above, the facts alleged by Plaintiff, even when construed in the light most favorable to her, do not provide a basis for inferring that WPI improperly influenced the decision, made by independent medical providers, to hospitalize Plaintiff on an involuntary basis.

   3.   Promissory Estoppel

   To prevail on her claim for promissory estoppel (Count XII), Plaintiff must prove all the same elements required for a breach of contract claim, except for the existence of consideration. *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004). Plaintiff based her promissory estoppel claim on the same portions of the Code of Conduct she identified in her breach of contract claim. Having already concluded that language was too aspirational and indefinite to be enforceable, the court dismisses Plaintiff's promissory estoppel claim.

   4.   Unjust Enrichment

   Unjust enrichment is an equitable claim available when a plaintiff has conferred a benefit on the defendant and the defendant has unjustly accepted or retained the benefit without paying for its value. *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009). The court dismisses Plaintiff's unjust enrichment claim (Count XIII) because she has not alleged that she

provided any benefits that unjustly enriched Defendant when it placed her on administrative withdrawal. Plaintiff has not alleged that she made any payments to Defendant for the semester. When she lost the opportunity to complete the semester, Defendant lost the corresponding value of any additional teaching or research she would have done. Additionally, Defendant took steps to accommodate Plaintiff before placing her on administrative withdrawal and only took that step after independent medical practitioners determined that she required a second period of hospitalization, just two weeks after she returned to campus following her first hospitalization and serious suicide attempt.

## IV.    CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss (Dkt. No. 12) is ALLOWED as to all counts. This case may now be closed.

It is so Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge